IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

JERRY HILL, JR.                                                                    PLAINTIFF

V.                                      CIVIL ACTION NO.: 3:13-CV-045-SA-SAA

SANDRA COBB and
COBB BAIL BONDING COMPANY                               DEFENDANTS

MEMORANDUM OPINION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Plaintiff's Motion for Summary Judgment [45].[1] For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

FACTUAL AND PROCEDURAL BACKGROUND

Based on the current record before the Court, the pertinent and undisputed facts are as follows:

Plaintiff Jerry Hill began working as a soliciting bail agent for Defendant Cobb Bail Bonding Co. ("Cobb Bail Bonding") at some point in the fall of 2010. Hill was hired by Sandra Cobb ("Cobb"), who is the owner and manager of Cobb Bail Bonding. Prior to working for Cobb Bail Bonding, Hill had worked as an agent with another bail agency for approximately ten years and came to Defendant without need for significant training. While working for Defendant, Hill continued to work on an inconsistent basis for one to two unrelated non-bonding

---

[1] In the conclusion of Defendants' Response, Defendants contend that the Court should enter summary judgment in their favor. Under Local Rule 7(b), "[a]ny written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule." Further, under Local Rule 7(b)(3)(C), "[a]ny motion must be an item docketed separately from a response." By failing to properly urge its purported motion for summary judgment, Defendants have failed to follow this Court's motions practice rules, and the Court declines to consider it as a motion. See Blackard v. City of Southaven, 2012 WL 827192, at *3 (N.D. Miss. Mar. 9, 2012) (noting that the Court's local rules governing motions practice are not optional).

enterprises. In his capacity as a bail agent, Hill was able to dictate his own work schedule. According to the unrebutted testimony, Hill's pay was dictated on a straight commission basis, although the specific terms of that arrangement are contested.

As described by Cobb, Hill was entitled to take a commission on every bond he wrote for the company. As she articulated: "bail bondsmen is an independent contractor. There's no such thing as minimum wage. You try to call to take me to minimum wages. Okay? If you wrote one bond a week, it's because you want to write that one bond a week; but it's not considered a labor act law, because you're a bail bondsmen [sic]. Bail bondsmen does not apply to that, because you get paid on percentage. Okay?" Although Hill had significant control over his office hours and the number of bonds he wrote, Cobb continued to maintain significant control over the individual bail agents and their duties.

As she described the situation, individual soliciting agents are unable to issue a bond in their individual capacity without the backing of the bond company. According to Cobb, "It's— when you get the power of the bond, okay, when you use the power of the bond, you take it over to the jail. And the jail knows that your name is up under that agent—that company name . . . and they'll accept that bond." As such, Cobb had significant authority to dictate how the agents performed their duties, and required each agent to obtain her approval before issuing a bond for any amount in excess of $3,000. Cobb provided the agents with a specific contract and application to use when agents issued bonds for the company and had specific demands regarding procedures that needed to be followed.

As Cobb recalled, although soliciting agents received training from state-sponsored classes, she gave additional instruction and training. Cobb stated:

> [S]ometimes I have to overturn [the outside instructors] because every sheriff is running his town differently. If the sheriff tells you

> one—you know, I'm not going to accept this, then you've got to go by what the sheriff say, no matter what we was taught in class . . . and bail bondsmen—some would listen to them and say, [w]ell, the sheriff said this; and, well, you got to fight that—no, you can't fight that sheriff in this town. This sheriff will get you out of his town. You abide by his law.

Because Cobb was required to ultimately take the responsibility for the bonds issued by her agents, she had an acute interest in monitoring their practices. As she testified, "the judge is never going to request for a bail bondman or secretary to come into court. They always request for that owner. So we have to be in court, especially to make sure that our client's there, because we're a big bail bonding—we're a company that writes big bonds." Cobb remained vigilant over the inter-office workings of the company as well, exclusively retaining the power to hire and fire employees and set their rate of pay.

Contending that he was an employee of Cobb Bail Bonding, Hill filed the present action under the Fair Labor Standards Act ("FLSA") in an attempt to recoup unpaid wages and overtime purportedly owed to him by Defendants. Plaintiff has now filed the present motion for summary judgment, arguing that judgment as a matter of law is due in his favor.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals both that there is no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). "When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." Lindsey v. Sears Roebuck and Co., 16 F.3d 616, 618 (5th Cir. 1994) (per curiam) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986)). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the applicable law in the case." Celotex, 477 U.S. 317, 322-23, 106 S. Ct. 2548. Thus, where the movant is the plaintiff, the movant must establish that there is no genuine dispute of material fact with regard to each element of his claim. Calderone v. United States, 799 F.2d 254, 260 (6th Cir. 1986); Southern Calif. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003).

The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## DISCUSSION AND ANALYSIS

### *I. Employee Status*

In order to state a claim for unpaid wages or overtime under the FLSA, the Plaintiff must first establish that he was an employee of the Defendant. See Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in

question constitute employment for purposes of the Act."); Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986) (Under [the overtime provisions of the FLSA], however, a plaintiff must also show that he was 'employed' by the defendant/employer in order to prove a violation."). Plaintiff contends that judgment as a matter of law is due to be granted on this issue. Under the FLSA, "employee" is defined as "any individual employed by an employer," while "employ" means "to suffer or permit to work." 29 U.S.C. § 203(e)(1), 29 U.S.C. § 203(g). As observed by the Fifth Circuit, the definition is particularly broad and is intended to encompass "some parties who might not qualify as such under a strict application of traditional agency law principles." Hopkins v. Cornerstone America, 545 F.3d 338, 343 (5th Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992)).

In order to gauge whether an individual is an employee or an independent contractor, the relevant inquiry is "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." Id. (citing Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 303 (5th Cir. 1998)). In making that determination, the court should consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. Hopkins, 545 F.3d at 343. No factor is sufficient or dispositive in and of itself; instead each should be considered in the larger context of the ultimate inquiry. Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1043-44 (5th Cir. 1987). Additionally, "[n]either contractual recitations nor subjective intent" can mandate a finding of

employee or independent contract status. Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1315 (5th Cir. 1976).

The "determination of whether a particular factual setting gives rise to coverage under the FLSA" is a question of law. Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984); see also Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir. 1983) ("as to the legal conclusion reached by the district court based upon this factual data, i.e., here that these welders are employees rather than independent contractors, we may review this as an issue of law"), Schultz v. Capital Intern. Sec., Inc., 466 F.3d 298, 304 (4th Cir. 2006). Thus, summary judgment is appropriate on the issue "provided there are no disputes of material historical facts." Keller v. Miri Microsys., 2014 WL 1118446, at *5 (E.D. Mich. Mar. 20, 2014); Zermeno v. Cantu, 2011 WL 2532904, at *3 (S.D. Tex. Jun. 24, 2011) (denying summary judgment because plaintiff's affidavit raised a genuine issue of material fact with regard to the economic reality of plaintiff's employment relationship).

Defendant, however, argues that "a clear independent contractual relationship existed between the [D]efendants and the [P]laintiff and that, for that reason alone, FLSA has no application to this case." As previously established, though, "[n]either contractual recitations nor subjective intent" can mandate a finding of employee or independent contract status. Usery, 527 F.2d at 1315. Accordingly, the Court analyzes the economic reality of the parties' relationship.

*A. Control*

In determining the degree of control exercised by the purported employer, the court should look to whether an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity, or whether the alleged employer still controls the meaningful economic aspects of the business. See Hopkins, 545 F.3d at 343. The autonomy of

the individual must be meaningful, as "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." Id. (quoting Mr. W. Fireworks, 814 F.2d at 1049). Illustratively, the Fifth Circuit gave extensive consideration to the control prong in Hopkins. There, the question before the court was whether an insurance company's sales leaders, who were "primarily responsible for recruiting, training, and managing a team of subordinate sales agents," were properly considered independent contractors or employees. Id. at 342. Although the plaintiffs there had agreed to remain independent contractors and were able to maintain control over their day-to-day affairs, the company still retained significant authority over the business operations of the sales leaders. Id.

In weighing the control factor, the court examined such considerations as who had the authority to hire, fire, assign, and promote the leaders' subordinate employees, who had the authority to authorize advertisements for their subordinate agents, who had control over the type and pricing of products sold, who had control over the geographic area in which the agents could operate, and how many sales leads each sales leader could receive. Id. at 344. Finding that the company retained control over the vast majority of these variables, the Fifth Circuit found that because the company controlled "the meaningful aspects of the business model," the plaintiffs could not "plausibly be considered 'separate economic entities' and the control factor therefore weighed in favor of employee status. Id. (quoting Mr. W. Fireworks, 814 F.2d at 1049).

In the case at bar, Plaintiff certainly had a great deal of control over his day-to-day activities. It is undisputed that Hill was required to work no specific hours, and could come and go as he pleased. Additionally, at times, Hill seems to have had significant authority over the amount of security he was required to obtain before issuing a bond. For instance, as Cobb described, "if he know those people in that area, then it's going to be of his discretion to take

how much money he want to take because he's going to be the one that's going to pick up the account."

On the other hand, Cobb maintained extensive control over the remaining aspects of actual bond transactions. Agents such as Hill were required to obtain her personal approval before issuing any bond in excess of $3,000. Additionally, the agents were required to use her contract and agreement, and Hill was reprimanded for deviating from that practice. Cobb issued several mandates regarding how many contact numbers agents needed to procure for potential clients, and set residency restrictions on how far away potential clients could live from Desoto County. Moreover, Cobb delegated supervisory authority to her secretaries, who observed the amounts agents were taking as security when she was away. As Cobb described it, the secretaries "basically run the bail bonding company." As such, the secretaries similarly monitored the agents' activities, ensuring that they were not deviating from Cobb's mandates. Finally, based on the record before the Court, Hill could not issue a bond without the backing of the company, and was dependent on his affiliation with Cobb Bail Bonding in order sell or issue bonds to any clientele.

On the whole, the Court determines that, as in Hopkins, Cobb Bail Bonding possessed control over the vast majority of the "meaningful aspects of the business model" in spite of the fact that soliciting agents such as Hill were able to self-schedule their work. Similar to Hopkins, Cobb retained control over the method of issuing bonds, whether bonds over $3,000 could be issued at all, and the geographic territory in which agents could obtain clients. Cobb retained the sole authority to hire and fire support staff, and delegated supervisory authority to that staff. Accordingly, the Court finds that, although a close call, the control factor leans in favor of employee status.

*B. Relative Investment*

As to the relative-investment prong, the court should compare the worker's individual investment to that of the purported employer. Id. at 344. The greater the investment made by the purported employer, the more likely the disputed party should be considered an employee rather than an independent contractor. Id. Here, Cobb Bail Bonding's investment clearly outweighs that of Hill. Based on the record before the Court, Cobb Bail Bonding took on the vast majority of overhead expenses, maintaining the office space, providing a shared desk for agents, and paying for support staff. As articulated by Cobb, the office space leased by the company was one of the primary factors in establishing a successful bonding business "[b]ecause we get a lot of walk in [business] because of the location that we're at." Accordingly, the Court finds that the relative investment prong weighs in favor of employee status.

*C. Opportunity for Profit or Loss*

Turning to the degree to which the worker's opportunity for profit or loss is determined by the alleged employer, the court should analyze whether the worker or employer controlled the "major determinants of the amount of profit which the [worker] could make." Usery, 527 F.2d at 1313. Whether such workers are paid on a commission or percentage basis is relevant, but not necessarily dispositive; instead, factors such as pricing of the service offered, service location, advertising, and customer volume should also be considered. Usery v. Pilgrim Equip. Co., Inc., 527 F.2d 1308, 1313 (5th Cir. 1976). In Thibault v. Bellsouth Telecommunications, Inc., for instance, the workers were paid a set hourly rate, but were able to control their opportunity for profit or loss by controlling costs such as "repairs, supply costs, food, water, housing, etc." 612 F.3d 843, 848 (5th Cir. 2010). As such, the Fifth Circuit determined that the factor weighed in favor of the plaintiffs' status as independent contractors. Id. Moreover, in Hickey v. Akra

9

Industries, Inc., the Fifth Circuit found that where a salesperson's profits were determined by his ability to increase customer volume and he was allowed to sell other products, he was likewise an independent contractor. 699 F.2d 748, 752 (5th Cir. 1983). Conversely, in Usery, the plaintiffs, who worked as dry cleaning operators, were paid a percentage of their sales volume, but the company retained control over the pricing of services, location of the sales area, and advertising. 527 F.2d at 1314. Additionally, there was no risk of loss involved for the plaintiffs. Id. The Fifth Circuit therefore concluded that "[n]o opportunity for loss of the capital investment in the [dry cleaning] station's operation and control by [defendant] of major determining factors of profit indicate that the operators are dependent upon [defendant], and therefore, that they are employees." Id.

In the present case, Plaintiff was paid a percentage-based commission for each bond he wrote. Although his opportunity for profit was largely driven by the volume of hours he was willing to work as well as his ability to attract new clients, Cobb Bail Bonding exclusively held any risk of loss. Although Cobb offered Hill the ability to take on his own risk in exchange for the ability to make a greater profit, that arrangement was specifically rejected by the parties. The following testimony from Cobb is illuminating:

> Q: [W]hat was your understanding of how [Hill] was supposed to be paid? I assume you made him an offer to come work for you?
>
> A. If you're a good bail bondsman, I'm going to pay you 50 percent; and I signed—and I had a contract, and that 50 percent contract stated that your [sic] liable to pay half of the bounty hunter's fee if the person misses court or we have to pay the bond off, then 50 percent will have to be paid with the company. He never would sign it. I dropped his 50 percent down to 40 percent.
> …
> I told him, I said—when the company let him go, the location that we was at, we—plenty of bail bondsmen was trying to get there because you're right across the street from the jail. . . . Everybody was trying to come and work for me. But I knew he was an experienced bail bondsman, okay. I offered him 50

10

10

> percent. . . . What they started doing was started writing bad bonds. They would just write anything, left and right, forfeitures coming in. I said, you know, I'm fixing to cut this off. We wrote a contract; we did another—we did a contract. Fifty percent, you're responsible for every bond that you have. You're going to pay for the bounty hunter fee; you're going to pay for them looking for them, gas and everything, because you're getting half of the company's money. They didn't want to do it, so they would never sign it. I dropped the percentage down, then, to 40 percent.
>
> …
>
> So they'd rather take the 40 percent, still write the garbage, where they don't have to be responsible for the 50 percent, where we take the responsibility of the garbage.

Accordingly, as in Hickey, Hill's ability to profit was largely dependent on his ability to increase customer volume based on his initiative and skill in attracting clients. Conversely, like in Usery, Cobb Bail Bonding continued to exercise control over the location of the business, controlled whether an agent could issue a bond in excess of $3,000, and whether an agent could issue a bond in a neighboring county or state. Moreover, the soliciting agents bore no risk of loss, as the company took the brunt of risk with regard to non-profitable bonds. As noted by the Fifth Circuit, there are commonly facts pointing in both directions on the employee status determination and the Court finds that observation particularly apt here. Carrell v. Sunland Constr., Inc., 998 F.2d 330, 334 (5th Cir. 1993). Nonetheless, because the parties specifically disavowed any type of relationship that would have placed a risk of loss on Hill, and the company exercised extensive control over the services Hill could offer and which potential clients he could or could not write bonds for, the Court finds that this factor leans slightly in favor of employee status.

### D. Skill and Initiative

With regard to the skill and initiative required in performing the job, the court should look for some unique skill set. Carrell, 998 F.2d at 345. For instance, the court has before noted that "[p]ipe welding, unlike other types of welding, requires specialized skills." Id. at 333.

"Routine work which requires industry and efficiency is not indicative of nonemployee status." Usery, 527 F.2d at 1311. In Herman v. Express Sixty-Minutes Delivery Services, Inc., the Fifth Circuit echoed its previous observation that "initiative, not efficiency determines independence." 161 F.3d 299, 305 (5th Cir. 1998) (quoting Mr. W Fireworks, 814 F.2d at 1053). As such, where a group of plaintiffs had been unable to exert their own initiative as to advertising, pricing, and choosing suppliers, the court found in favor of employee status. Mr. W Fireworks, 814 F.2d at 1053.

In this case, Hill had extensive training as a bail bondsman, having worked for a competing company for nearly a decade. Additionally, he had already been licensed by the state and came to Cobb Bail Bonding with little need for additional training. His experience granted him an understanding of the unique bail bonding industry as well sources of referrals within the community. And, although some of the prime areas for initiative were controlled by the company, Hill was nonetheless able to generate and grow business on his own by building and maintaining a network of clients and acquaintances. Accordingly, the Court finds that this prong weighs against employee status.

*E. Permanency of the Relationship*

Finally, in turning to the permanency of the relationship between the parties, the court should consider the temporal length of the relationship between the parties, with longer periods weighing in favor of an employer/employee relationship. Hopkins, 545 F.3d at 346. In Carrel, where the welders "moved from job to job, company to company, and state to state" for a six to nine month construction season, the Fifth Circuit found the situation indicative of an independent contractor relationship. 998 F.3d at 332.

Here, Hill worked for Cobb Bail Bonding for a multiple year period. Although he held other jobs during that tenure, none of his outside employment involved writing bonds. Moreover, his employment with his previous bond company had lasted approximately a decade, and, unlike an individual truly in business for himself, Hill's ability to write bonds was dependent upon an affiliation with a bond company. Cobb, on the other hand, argues that Hill was a highly sought after bondsman and could have taken his business elsewhere had he so desired. As noted in Mr. W Fireworks, though, "it is not what the [parties] could have done that counts, but as a matter of economic reality what they actually do that is dispositive." 814 F.2d at 1047; see also Hopkins, 545 F.3d at 346 (rejecting a similar argument). Accordingly, the Court finds that the longevity of the relationship leans in favor of employee status.

### F. Employee Status Conclusion

Based on this analysis, the Court finds that there is no genuine dispute of material fact as to whether Hill was engaged as an employee or an independent contractor. Because the control, investment, opportunity for profit and loss, and permanency factors all weigh in favor of employee status, the Court finds that Hill was indeed an employee of Cobb Bail Bonding for purposes of the FLSA. The Court emphasizes, however, that this holding is extraordinarily factually dependent and is based on the unique economic realities exhibited between these specific parties. See Thibault, 612 F.3d at 848-49 (reiterating that the court's conclusion did "not hold that *all* splicers are always independent contractors" and observing that "the nature of [the opinion's] analysis suggeste[ed] that in some cases splicers might be employees.").

### II. Engaged in Commerce

Plaintiff further claims that there is no dispute as to whether Hill was engaged in interstate commerce. The FLSA applies only to (1) an employer that has "employees who in any

13

workweek [are] engaged in commerce or in the production of goods for commerce" ("individual coverage"), or (2) an employer that has employees "employed in an enterprise engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). See 29 U.S.C. § 206(a)(1), 29 U.S.C. § 207(a)(1), Martin v. Bedell, 955 F.2d 1029, 1032 (5th Cir. 1992). Notably, the plaintiff bears the burden of showing individual or enterprise coverage. Mendoza v. Detail Solutions, LLC, 911 F. Supp. 2d 433, 439 (N.D. Tex. 2012) (citing D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 120, 66 S. Ct. 925, 90 L. Ed. 1114 (1946)). Plaintiff concedes that enterprise coverage does not apply here, but hangs his hat on the individual coverage provision.

To determine whether an individual is personally engaged in interstate commerce, the Fifth Circuit applies a "practical test," questioning "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." Sobrinio v. Med. Ctr. Visitor's Lodge, Inc., 474 F.3d 828, 829 (5th Cir. 2007) (quoting Mitchell v. H.B. Zachry Co., 362 U.S. 310, 324, 80 S. Ct. 739, 4 L. Ed. 2d 753 (1960)). It is insufficient to merely affect commerce, instead the employee must generally directly participate in the "actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, e.g., transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel." Thorne v. All Restoration Serv's, Inc., 448 F.3d 1264, 1266 (11th Cir. 2006). There is no de minimis requirement, however, and "[a]ny regular contact with commerce, no matter how small, will result in coverage." Sobrinio, 474 F.3d at 829 (quoting Marshall v. Vincent Transp. Co., Inc., 603 F.2d 1122, 1124 (5th Cir. 1979)).

Helpful for purposes of comparison here is the Fifth Circuit's decision in Sobrinio, 474 F.3d at 829. There, the court gave consideration to whether an individual employed by a motel in a multi-faceted position as a janitor, security guard, and driver was engaged in interstate commerce. Id. Although the plaintiff there frequently drove out of state guests to local venues and attractions, he did not drive them to the airport or any other transportation center. Id. Accordingly, the court found that although the plaintiff routinely interacted with out of state guests, the guests' "interstate travel terminated when they first reached [the motel] and did not start again until they ultimately departed." Id. at 830. Thus, contact with them did not "alter the local quality of [plaintiff's] work" as his "job description amount[ed] to nothing more than providing local transportation for motel patrons." Id.

In the present case, Plaintiff centers his claim on Hill's purported use of the telephone to contact out of state clients in their home states, Cobb Bail Bonding's acceptance of credit card payments, and Hill's alleged service of out of state clients travelling through Mississippi. As Hill stated in his affidavit, he was required "to make significant out-of-state contacts with clients" by "routinely writing bonds for clients in the states of Tennessee and Arkansas as well as Mississippi." According to Hill, this called for him "to make frequent contact with these out-of-state clients by phone at least once a week and make in-person visits when clients failed to comply with their bond restrictions." In her deposition, Cobb corroborated Hill's out of state dealings. For instance, apparently referring to her reasons for firing Hill, she stated, "You give me a bond, a man that lives in Tennessee. Across the border is Kentucky. . . . Why would you write a bond that [sic] a man lives six to seven hours away? He's not coming back to the state of Tennessee. And when I see Kentucky and he works in Kentucky, that's a forfeit." Due to such

bonds, Cobb claimed that she "paid too much thousands of dollars off on him, too much thousands of dollars."

Additionally, Cobb testified that on one occasion, Hill recorded a client's address as 201 Poplar. As she recalled, "I asked Mr. Hill, why did you put down this boy lived at 201 Poplar. Every—I'm quite sure you know where 201 Poplar is, right? . . . Okay. So I'm like, 'Why would you put down 201 Poplar?' 'Well, that's where he told me he was at.' . . . That's the jail in Memphis, Tennessee. That's the kind of stupid bonds I'm telling you, you know, I'm talking about."

Based on the present record, the Court determines that Hill was indeed engaged in interstate commerce. Although merely serving out of state clients while they were in Mississippi would affect interstate commerce no more than the local transportation of out of state guests as in Sobrinio, 474 F.3d at 829, the unrebutted evidence before the Court reveals that Hill serviced out of state clients and that he routinely communicated with those persons on the phone and through other means even after they returned to another state. Accordingly, the Court determines that Hill has met his burden of establishing individual coverage under the FLSA.

### III. Joint Employer Status

Plaintiff additionally contends that Sandra Cobb and Cobb Bail Bonding should be considered joint employers, and that judgment as a matter of law is due on this issue as well. Under the FLSA, an "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Whether an individual or entity is an employer similarly turns on the "economic reality" of the working relationship. Goldberg v. Whitaker House Co-op, Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 100 (1961). The Fifth Circuit has articulated that the definition of employer is "sufficiently broad to encompass an

individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees." Reich v. Circle C Investments, Inc., 998 F.2d 324, 329 (5th Cir. 1993) (citing Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194 (5th Cir. 1983)). Further, if an "individual with managerial responsibilities is deemed an employer under the FLSA, the individual may be jointly and severally liable for damages resulting from the failure to comply with the FLSA." Lee v. Coahoma Co., 937 F.2d 220, 226 (5th Cir. 1991) (citing Donovan v. Grim Hotel, Inc., 747 F.2d 966, 972 (5th Cir. 1984)).

In making such a determination, the court should consider whether the purported employer: (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Watson v. Graves, 909 F.2d 1549, 1553 (5th Cir. 1990); see also Itzep v. Target Corp., 543 F. Supp. 2d 646, 653 (W.D. Tex. 2008). Again, assuming there are no material facts in dispute, whether an individual or entity is a joint employer is a question of law. Itzep, 543 F. Supp. 2d at 653 (citing Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1206 (7th Cir. 1986)).

In the case at bar, Defendants do not even contend that, should the Court find that Cobb Bail Bonding was indeed Hill's employer, Sandra Cobb should not also be considered an employer. Based on the current record, the Court finds that Cobb should be considered a joint employer. First, Cobb undoubtedly had the power to hire and fire employees, and testified that she was the only individual at the company vested with such power. Additionally, although she did not set work schedules for soliciting agents such as Hill, Cobb testified that she would "always call [her] workers and see what's going on at the office" regarding their work hours.

Moreover, she testified that she set all office policy, determined how each worker should be paid, and maintained records for how many hours personnel worked and how much they were paid. Accordingly, the Court determines that an employee relationship existed between Hill and Cobb and she may be jointly and severally liable for any potential violations.

### IV. Liability Under the FLSA

Plaintiff's motion for summary judgment additionally seeks judgment as to the ultimate question of liability, contending that Hill has shown there is no genuine dispute of material fact as to whether Plaintiff is "entitled to minimum wage and overtime" damages. To recover under the FLSA under either his overtime or minimum wage theory, however, the Plaintiff must first show that he worked without adequate compensation. Allen v. Bd. of Public Educ. for Bibb Co., 495 F.3d 1306, 1315 (11th Cir. 2007); Reeves v. Int'l Tel. and Tel. Corp., 616 F.2d 1342, 1351 (5th Cir. 1980); Bass v. City of Jackson, 878 F. Supp. 2d 701, 713 (S.D. Miss. 2011). Where an employer fails to keep proper and accurate records, though, the Supreme Court has held that an employee may nonetheless carry such a burden "if he proves that he has in fact performed work for which was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946).

In Allen, the district court granted summary judgment in favor of the employer, finding that Plaintiffs "had failed 'to state with any clarity the hours they allegedly worked overtime' and had provided testimony that was 'so vague and contradictory that it [was] impossible to determine whether they had claims against the Board.'" 495 F.3d at 1315. Relying on the relaxed burden framework of Anderson, the Eleventh Circuit reversed, finding that the plaintiffs had called into question the accuracy of the defendant's records and noting that at trial, plaintiffs

18

might be able to show the amount and extent of their unpaid overtime wages "as a matter of just and reasonable inference" by providing a calendar of after-hour meetings, and testimony from other individuals indicating that they had attended such meetings. Id. at 1316.

In the case at bar, it is Plaintiff who seeks summary judgment, relying solely on Plaintiff's sworn affidavit in which he avers that he "routinely worked fifty-five (55) hours per week for Defendants." Defendants, on the other hand, ardently refute that characterization, arguing that Plaintiff never worked forty hours in a week due to his obligations with other employment. The Court finds the issue wholly inappropriate for a summary judgment determination. Although Plaintiff may be able to rely on the relaxed burden of Anderson, there is currently a genuine dispute of material fact as to whether Plaintiff in fact performed work for which he was not compensated. Additionally, Plaintiff's bare and conclusory affidavit, with nothing more, is insufficient to "show the amount and extent of that work as a matter of just and reasonable inference." Accordingly, summary judgment is denied as to the question of liability.

## CONCLUSION

The Court grants in part and denies in part Plaintiff's Motion for Summary Judgment [45]. The motion is granted insofar as Plaintiff seeks a determination that Hill was an employee, that Hill was engaged in interstate commerce, and that Cobb and Cobb Bail Bonding were joint employers. The Court again, however, emphasizes that such a conclusion is reached solely with regard to the particular factual situation presented here. As to the ultimate question of liability, the Court denies Plaintiff's motion, finding that the resolution of that dispute must be decided at trial.

SO ORDERED, this the 1st day of August, 2014.

                                        **/s/ Sharion Aycock**
                                        **U.S. DISTRICT JUDGE**